FILED

2014 Mar-31  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LADONNA L. GAUTNEY,            }
                               }
        Plaintiff,             }
                               }    Case No. 2:13-CV-324-WMA
v.                             }
                               }
TENNESSEE VALLEY AUTHORITY     }
BOARD OF DIRECTORS,            }
                               }
        Defendant.             }

## MEMORANDUM OPINION

This case comes before the court on the motion of defendant Tennessee Valley Authority Board of Directors ("TVA") for summary judgment.  Plaintiff, Ladonna Gautney ("Gautney"), instituted the action claiming that she was discharged by TVA in retaliation for her protected charge of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1]  TVA moves for summary judgment based on the Title VII national security exemption, 42 U.S.C. § 2000e-2(g), and for an absence of relevant disputed facts.  For the reasons stated below, the court finds that the national security exemption does not preclude judicial review, but that TVA is entitled to summary judgment on the merits.

---

[1] The complaint alleges discrimination as well as retaliation, but the final agency decision on Gautney's discrimination charge was issued on March 13, 2012, and this action was initiated well after the ninety-day period from receipt in which to file a civil action. *See* 42 U.S.C. § 2000e-5(f)(1).

**BACKGROUND**

Gautney worked as a security guard at the TVA Browns Ferry Nuclear Plant from May 2004 to January 4, 2012. Security guards must pass a yearly tactical weapons qualification course ("TWQC") in no more than four attempts. After Gautney failed all four TWQC tests in 2011, TVA discharged her. Gautney contends that TVA caused her to fail the TWQC and subsequently discharged her in retaliation for her complaint of sex discrimination that she filed with the Equal Opportunity Compliance ("EOC") on June 30, 2011.

Aftermath of 2011 EOC Complaint

Gautney claims that she suffered retaliation for her EOC complaint of June 30, 2011, by being shunned, then discharged. Many of Gautney's colleagues and trainers treated her differently after the EOC complaint by refusing to talk to her and by generally excluding her from the group camaraderie. Two of the five trainers who scored Gautney's TWQC tests in 2011 took part in this shunning: Joe Lovett ("Lovett") since April 2011[2] and Pete Thompson ("Thompson") since early December 2011 when he gave his deposition in the EOC investigation. The other three trainers who scored Gautney's TWQC tests, including Terry Nixon ("Nixon"), did not

---

[2] Gautney describes the change in her colleagues' behavior as beginning in April 2011, even though she filed the actual EOC complaint in June 2011. Before filing her EOC complaint, Gautney complained of sex discrimination to her supervisor and met with an EOC counselor in April 2011. Presumably, the shunning behavior began in response to Gautney's informal complaints in April 2011 and continued after the actual EOC complaint. The EOC complaint is the only protected activity claimed in the complaint.

treat her differently after her EOC complaint.  Although one trainer refused to help Gautney with weapons training, she does not claim that any other trainer did so. Doc. 27-19, pp.225-28.

<u>TWQC Tests</u>

The TWQC tests include a tower portion and a ground portion. The tower portion features prominently in Gautney's claims.  In the tower portion, the trainer pre-loads a magazine for the first weapon——a thermal rifle——with four live rounds then four dummy rounds.  The exercise calls for the guard to load the thermal rifle and fire four rounds then put it down to switch weapons.  The dummy rounds function as a safety precaution in case the rifle accidentally discharges when the guard quickly puts it down.  After shooting from the thermal rifle, the guard picks up the second weapon——a trijicon——and fires four rounds.  Any rounds discharged after the 50-second time limit for the tower portion causes a one-point deduction but does not result in automatic failure of the test.  The ground portion has a time limit of 6 minutes and 45 seconds and requires the guard to fire two weapons——an M-16 and a handgun——in various positions.  The TWQC policy provides for trainers to put one dummy round in the magazine of each weapon during the ground portion to simulate misfires, but the guard does not know where in the magazine the dummy round will be.  To pass the test, a guard must shoot with 80% accuracy out of 60 shots and finish within the time limits.

Gautney attempted to pass the TWQC four times in November and December 2011. Immediately before each test, she completed a practice round. Her first TWQC test took place on November 21, 2011. After failing it, she took the test again on the same day per standard procedure and failed the second time. Gautney does not claim that she experienced any irregularities with the first test or the second test, although she does claim that she was sick that day and it was "apparent" that she was in no condition to proceed. Doc. 28-1, ¶4. Due to her failing the first and second TWQC tests, TVA issued a 30-day Notice of Termination that gave Gautney until December 21 to pass the TWQC.

Gautney's third TWQC test took place on December 8, 2011. She claims that she experienced a testing irregularity during the ground portion but does not remember if it occurred during the practice round or the qualifying round.[3] The irregularity only bears on Gautney's failing the test if it occurred during the qualifying round. In either scenario, the evidence does not show that the dummy round caused Gautney to fail. Gautney's weapon fired a dummy round in the first prone position of the ground portion, the timing of which she claims was atypical. The trainers

---

[3] In her deposition, Gautney admitted that she fired the dummy round during the third TWQC test's practice round, which would not have affected her qualifying score. In her declaration, however, she states that she does not remember whether it occurred during the practice round or the qualifying round. Pursuant to FED. R. CIV. P. 56, the court makes the reasonable interpretation favorable to Gautney that she could have fired the dummy round during the qualifying round because, otherwise, the dummy round would have no significance to her failing the third TWQC test.

stopped the test clock while they changed the magazine.  Although Gautney testifies that the dummy round made her exceed the time limit on the ground portion, the uncontradicted evidence of Gautney's test scores indicates otherwise.  In the practice round, she exceeded the time limit by 58 seconds, far longer than the number of seconds that shooting one dummy round would have cost her.  She also had a 65% shooting accuracy, nine hits less than the passing score of 80%.  In the qualifying round, Gautney met the time limit, so the dummy round did not make her fail on that basis.  She also had a 63.3% shooting accuracy, ten hits less than the passing score; her shooting percentage alone caused her to fail by more than one dummy round can explain.  Whether the dummy round fired during the practice round or the qualifying round, it is not a reasonable inference that it caused her to fail.  Gautney also notes that, during both rounds of the third TWQC test, the trainers did not talk to her, shout encouragement, or "provide [her] with emotional support" as they had in previous years. Doc. 28-1, ¶7.

Gautney's claims center on her fourth TWQC test on December 13, 2011.  Although she failed the practice round by one shot, she still felt "ready" that day. Doc. 27-19, p.107.  The trainers who scored Gautney's fourth test were Nixon for the tower portion and Thompson, Lovett, Roger Nichols, and Robert Dawson for the ground portion.  Of these five trainers, only Thompson and Lovett had shunned Gautney after her EOC complaint.  For the qualifying round,

her uncontradicted scores show that she exceeded the tower time limit by one second and had a 78.3% shooting accuracy, one hit less than the passing score.  Gautney does not claim that her shooting errors on the ground portion resulted from irregularities; she focuses on the tower portion.

As described above, the tower portion of Gautney's test required her to fire four rounds from a thermal rifle, then fire four rounds from a trijicon in 50 seconds.  Before Gautney's test, the trainer in the tower, Nixon, pre-loaded four live rounds and four dummy rounds in the thermal rifle magazine per standard procedure.  He started the timer when Gautney positioned the thermal rifle.  Nixon testifies that he heard Gautney pull on the charging handle twice, which ejected one of the four live rounds.  Gautney remembers pulling the charging handle only once.  Nixon testifies that he heard her fire three live rounds and one dummy round.  Gautney remembers shooting two or three live rounds and one dummy round.  When Nixon heard the ping sound of the dummy round firing, he stopped the timer and called a cease-fire to load another live round.  Nixon re-started the timer after Gautney had repositioned herself.[4]  Gautney then fired the remaining live round

---

[4] Gautney's testimony is unclear whether Nixon re-started the timer atypically early after she fired the dummy round.  Gautney claims that Nixon re-started the timer before she had re-sighted her target and, in the past, trainers had waited until she had the target in sight.  However, she testified that (1) "you turn the clock back on as soon as you pick up" the rifle, Doc. 28-1, p.84; (2) "as soon as he turns the clock back on, then you've got to try to find [the target], and then start shooting []," *id*. at p.85; and (3) she does not remember if she had already found the target when Nixon re-started

from the thermal rifle, switched to the trijicon, and fired four live rounds from the trijicon.  She fired the fourth round after the time limit, which deducted one point from her score.  Because Gautney failed the fourth TWQC test by one point, she contends that the dummy shot in the tower caused her to fail.

Leading up to her TWQC tests on December 8 and December 13, Gautney found limited opportunities to train on the practice range. She had one 30-minute training session with Thompson on November 30, 2011.  Gautney says that Thompson appeared rushed and "aggravated at having to help [her]." Doc. 28-1, ¶ 6.  As for independent practice, Gautney testifies that she kept trying to schedule time on the practice range, but Nixon "continually told" her that the range was in use by military groups and new hire groups. Doc. 28-1, ¶5.  She further states that Nixon "did not point out any open times for the range that I could use. He left me with the impression that I was on my own in terms of finding a way to practice." *Id.*  Nixon testifies that TVA policy provides for re-testing guards to have a "reasonable opportunity" to use the practice range but does not allow trainers to cancel previously scheduled trainings of large groups to accommodate re-testing guards. Doc. 27-1, ¶14.

---

the timer, *id.*

Gautney's Discharge

Following Gautney's fourth TWQC test on December 13, 2011, Nixon reviewed her targets to verify the scores and gave the test results to Patrick Parker ("Parker"), Gautney's manager. Parker issued Gautney's discharge on January 4, 2012. Gautney claims that Parker set her up for discharge by arranging for her to receive the dummy round in the ground portion of the third TWQC test and the dummy round in the tower portion of the fourth TWQC test; she does not claim that Nixon participated. TVA responds that Parker discharged Gautney in accordance with TVA policy and he had no discretion to allow her to continue her duties without passing the TWQC. Neither Parker nor Gautney's shift supervisors, Parker's subordinates, were present at her fourth TWQC test.

Gautney is the only security guard at the Browns Ferry Nuclear Plant whom TVA has terminated for failing the TWQC after four attempts. Seven other guards since 2008 have failed at least one TWQC test but passed a subsequent test. For reasons other than failing the TWQC, TVA has discharged six other guards since 2009.

## DISCUSSION

To grant summary judgment, a court must determine that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. A genuine dispute of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  For the purposes of summary judgment, the court views all admissible evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  The court's function does not extend to "weigh[ing] the evidence and determin[ing] the truth of the matter" but is limited to "determin[ing] whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

TVA moves for summary judgment based on (A) the national security exemption to Title VII and (B) the merits of Gautney's retaliation claim.

## A.   National Security Exemption

TVA moves for summary judgment claiming that the national security exemption to Title VII precludes its liability for Gautney's discharge.  The national security exemption provides that it is not unlawful for an employer to discharge an employee if

(1)   the position or access to the premises "is subject to any requirement imposed in the interest of the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President;" and

(2)   the employee has not fulfilled or has ceased to fulfill

9

that requirement.

42 U.S.C. § 2000e-2(g).  TVA claims that, when Gautney failed her four TWQC tests, she ceased to fulfill a requirement imposed in the interest of national security under a security program administered under the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*

The Atomic Energy Act allows the issuance of commercial nuclear licenses only if the license is consistent with "the common defense and security" of the public. 42 U.S.C. § 2133.  The Nuclear Regulatory Commission ("NRC") performs the licensing and regulatory functions under the Atomic Energy Act. Energy Reorganization Act of 1974, 42 U.S.C. § 5801 *et seq.* (1970 ed., Supp. V).  The NRC's "prime area of concern in the [nuclear] licensing context ... is **national security**, public health, and safety." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 550 (1978) (citing 42 U.S.C. §§ 2132, 2133, 2201) (emphasis added).  To this end, the NRC requires that nuclear licensees implement an approved tactical weapons qualification test for their security personnel each year. 10 C.F.R. Pt. 73, App. B § VI(F). Until employees satisfy this and other qualification requirements, nuclear licensees "may not allow any individual to perform any security function, assume any security duties or responsibilities, or return to security duty." *Id.* at § VI(A)(6).  The NRC's role and its focus on national security strongly suggest that the qualification requirements for nuclear licensees' security

10

personnel are imposed in the interest of national security. The TWQC requirement for TVA's security guards is a NRC-approved tactical weapons qualification test and, therefore, satisfies the first element of the national security exemption.[5]

Gautney contends that the national security exemption does not apply based on the second element because she never "ceased to fulfill" the TWQC requirement. *See* 42 U.S.C. § 2000e-2(g)(2). Rather, she claims that TVA sabotaged her TWQC tests. This contention necessitates that the court review TVA's testing process and its finding that Gautney failed the TWQC, a prospect that implicates the policy behind the national security exemption. "A Title VII claim is nonjusticiable if reviewing it requires the court to review the merits of a decision by the executive branch" on discretionary matters of national security. *Arafi v. Mandarin Oriental*, 867 F. Supp. 2d 66, 74 (D.D.C. 2012); *see Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). Accordingly, the court acknowledges that it should not review the content of the NRC-approved TWQC or the NRC's provisions on qualification requirements. However, the court can review whether **TVA** retaliated against Gautney in its **administration** of her TWQC tests without intruding on the NRC's discretion as a government agency. TVA and

---

[5] Gautney argues that the national security exemption only applies to security clearance decisions. Although this argument has support in EEOC and legislative materials, the plain language of the statute contains no such limitations. *Compare* 42 U.S.C. § 2000e-2(g), *with* EEOC, *Policy Guidance on the Use of the National Security Exception Contained in § 703(g) of Title VII*.

other commercial nuclear licensees do not have carte blanche to retaliate or discriminate against their employees simply because they do so under the guise of implementing a NRC requirement. *See* EEOC, *Policy Guidance on the Use of the National Security Exception Contained in § 703(g) of Title VII* ("Employers cannot, merely by invoking national security, exempt themselves from coverage of the nondiscrimination provisions of [Title VII].")

Two of the limited cases that address the national security exemption and licensees have particular relevance to Gautney's claim.[6]  In the first case, a security guard was discharged for failing a weapons qualification test for a rifle that the employer-licensee had recently added as a required weapon. *Fisher v. Securitas Sec. Servs. USA, Inc.*, No. 4:08-cv-1634-RBH-TER, 2009 WL 5868580, at *5 (D.S.C., Dec. 2, 2009).  The guard in *Fisher* did not dispute that she ceased to fulfill the NRC requirement; her complaints did not center on the testing process, but on the test content and whether the licensee uniformly discharged guards who failed the test. *Id.*  The *Fisher* court[7] found that the licensee did not show that the national security exemption should apply because

---

[6] The majority of published cases on the national security exemption involve a government agency directly making security clearance decisions. *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518 (1988).

[7] *Fisher* consists of a Report and Recommendation by a magistrate judge. *Fisher v. Securitas Sec. Servs. USA, Inc.*, 2009 WL 5868580, at *5 (D.S.C., Dec. 2, 2009).  The parties did not object to the national security exemption section.  The district judge adopted the national security exemption section finding after reviewing for clear error. *Fisher v. Securitas Sec. Servs. USA, Inc.*, No. 4:08-cv-01634-RBH, 2010 WL 568234, at *4 (D.S.C., Feb. 12, 2010).

"the record is devoid of any evidence showing that the **specific** requirement regarding the .308-caliber rifle is pursuant to the [NRC] requirements." *Id.* (emphasis added).  In the present case, the NRC explicitly requires that security personnel pass an approved "tactical weapons qualification," like the TWQC. 10 C.F.R. Pt. 73, App. B § VI(F).  Upon initial examination, then, *Fisher* suggests that this court should apply the national security exemption.  However, *Fisher* involved questions about the **content** of the test, not the licensee's administration of the test.  With *Fisher* involving a more substantive inquiry and different policy concerns, the parallel to the present case is inexact, and it does not necessarily follow that *Fisher* would counsel applying the national security exemption to the facts presented here.

The second relevant case involving the national security exemption and licensees has dissimilar facts but includes an analysis that this court finds persuasive. *See Moore v. Exelon Generation Co., LLC,* No. 12 C 1955, 2012 WL 5304202, at *3 (N.D. Ill. Oct. 25, 2012).  In *Moore*, a commercial nuclear licensee hired a person then discharged him after he was denied security clearance to access the premises. *Id.* at *1.  Although the facts squarely implicated the national security exemption, *see Bennett v. Chertoff*, 425 F.3d 999, 1000 (D.C. Cir. 2005), the *Moore* court emphasized that employers cannot enforce position requirements selectively and cannot evade Title VII simply because a requirement

13

involves national security. *Moore,* 2012 WL 5304202, at *3.  The *Moore* court further said that it "certainly can make the determination that the national security criteria are not being applied uniformly without having to delve into whether the criteria are over restrictive, for example." *Id.*  The *Moore* court, then, concluded that it could properly review the merits of the Title VII claim notwithstanding the national security exemption. *Id.*  This analysis corresponds to EEOC policy guidance and does not interfere with the executive branch's discretion. *See* EEOC, *Policy Guidance on the Use of the National Security Exception Contained in § 703(g) of Title VII*; *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988).

In light of the statute and limited case law, the court concludes that the national security exemption does not apply so as to preclude its review of Gautney's claim that TVA caused her to fail the TWQC in retaliation for her EOC complaint.  The court will confine itself to reviewing possible defects in TVA's administration of the TWQC and not the TWQC's content or the related NRC regulations.

**B.   Retaliation Claim**

Title VII claims based on circumstantial evidence, as in this case, are analyzed using the three-step framework from *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013).  Gautney must first

14

make out a prima face case of retaliation and thereby raise a presumption of discrimination. *Id.*   TVA must then provide a legitimate, non-discriminatory reason for the adverse employment action, which, if successfully shown, rebuts the presumption of discrimination. *Id.* Lastly, Gautney must show that TVA's facially adequate reason is a pretext and was not the real reason for the adverse action. *Id.*   This section examines (1) Gautney's prima facie case and (2) TVA's offered reason for discharging her together with Gautney's evidence of pretext.   The court finds that Gautney has failed to present a prima facie case and, even if she had, she has not offered sufficient evidence of pretext to defeat TVA's motion for summary judgment.

**1.   Prima Facie Case**

To make a prima facie case for Title VII retaliation, Gautney must show (I) that she engaged in statutorily protected activity; (ii) that she suffered adverse employment action; and (iii) that a causal relationship exists between the events. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (citations omitted).   A causal relationship can be established through evidence that TVA's "desire to retaliate" against the protected expression was the "but-for cause" of the adverse action. *See Univ. of Texas Southwestern Medical Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

Gautney has established the first and second elements.   She engaged in statutorily protected activity when she filed her EOC

charge on June 30, 2011.[8] She suffered adverse action when she was discharged.[9] *See Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1185 (11th Cir. 1984).

Gautney has, however, failed to establish the third element, a causal connection between her EOC complaint and her discharge. Gautney's discharge took place five months after she submitted her EOC complaint. Such a five-month interval does not suffice to show causation "in the absence of any other evidence of causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). Gautney seeks to provide "other evidence" by showing that her EOC complaint and her discharge were "linked by a chain of intervening retaliatory acts." *Edwards v. Nat'l Vision, Inc.*, 946 F. Supp. 2d 1153, 1175-76 (N.D. Ala. 2013) (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998)). The intervening retaliatory acts consist of (1) her purported disparate treatment

---

[8] Gautney's EOC complaint is the only protected activity at issue. Other employees' depositions in the investigation of Gautney's EOC complaint do not constitute protected activities **for Gautney**, although they do for the deposed employees. *Simpson v. State of Ala. Dep't of Human Resources*, No. 12-11710, 2012 WL 6621400 at *955 (11th Cir. Dec. 18, 2012); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1184 (11th Cir. 1997). Gautney's talk with Nixon that one trainer had shunned her was not pled as protected activity in the complaint and, even if it had been, Gautney's pertinent testimony does not have enough specificity for an essential element of her claim. *See* Doc. 27-19, p.226.

[9] Gautney's colleagues and trainers shunning her, separate from other acts, does not qualify as adverse action. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("[S]nubbing," "petty slights, minor annoyances, and simple lack of good manners" are not actionable). Gautney does not claim that the shunning resulted in lost professional opportunities. The trainers continued to train her. For the one exception, Jason Steele, Gautney admitted that other trainers were available to assist her when Steele would not. Also, the complaint only alleges discharge as an adverse action.

in not being offered the opportunity to cheat on her TWQC tests,
(2) her pervasive shunning by colleagues and trainers,(3) the
purported sabotage of her TWQC tests, (4) inadequate training
opportunities, and (5) her purported disparate treatment in failing
the TWQC tests and being discharged on that basis.[10]   Each
contention is addressed in turn.

(1) *Disparate Treatment in Cheating*

Gautney offers as evidence of intervening retaliatory acts her
testimony that other security guards may have cheated to pass their
TWQC tests, and the trainers did not offer to let her do likewise.
This contention suffers from two defects.  First, Gautney has not
offered evidence that any security guard has cheated on the **TWQC**
tests.  She only has personal knowledge of guards cheating on the
written tests.  Evidence of cheating on written tests does not
constitute evidence of cheating on the TWQC tests.  Second, Gautney
testifies that she did not ask her trainers for the opportunity to
cheat on her 2011 TWQC tests.  Without evidence that cheating on
TWQC tests occurred, and without evidence that Gautney asked to
cheat, the fact that her trainers did not offer to let her cheat on

---

[10] TVA argues that positive employment actions cut against an inference
of retaliation. *Tucker v. Sejong Ala., LLC*, No. 11-cv-268, 2012 WL 2389327 at
*7 n.10 (M.D. Ala. May 4, 2012), *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23,
32-33 (1st Cir. 2007).  Even if TVA is correct, the evidence does not show
that TVA took any positive employment actions concerning Gautney between her
EOC complaint and her discharge.  Gautney had more income in 2011 than in
2010, but the higher income derived from overtime, not a pay raise.  Gautney
passing other tests does not qualify as positive employment actions by TVA;
she maintained her qualifications but did not experience positive change.

her TWQC tests does not qualify as an intervening retaliatory act.

   (2) *Shunning*

   Gautney contends that many colleagues and trainers shunned her after she informally complained of sex discrimination to Parker and after she later filed a EOC complaint.   This shunning included acting standoffishly towards Gautney, not talking to her socially, not cheering her on during practices and tests, and excluding her from the group camaraderie.   Shunning by those individuals involved in scoring Gautney's TWQC tests and in discharging her has particular significance for demonstrating causation.   Two of the five trainers who scored Gautney's fourth TWQC test on December 13, 2011, Lovett and Thompson, shunned her.   The manager who issued Gautney's discharge, Parker, shunned her.

   Gautney has presented circumstantial evidence that the shunning by these three individuals was causally related to her EOC complaint.   One of the trainers, Lovett, began shunning Gautney in April 2011 when Gautney informally complained to Parker about sex discrimination, which formed the basis for her EOC complaint. Thompson began shunning Gautney in early December 2011 when he gave his deposition in the EOC investigation of Gautney's complaint. The evidence connecting Parker's shunning of Gautney to her EOC complaint is more tenuous.   The comments that Gautney identifies as showing Parker's animus, e.g., Doc. 27-19, p. 253-54 ("Why is it always you?"), are the same comments that she claims Parker made in

18

connection with her informal complaints before she filed an EOC complaint, *see* Doc. 27-24, p.6.  This evidence, however, permits the reasonable inference that Parker's repeated comments to Gautney show animus related to Gautney's informal complaints of sex discrimination, and Gautney's subsequent EOC complaint.

The shunning by three individuals involved in scoring Gautney's TWQC tests and in discharging her does not establish causation for her prima facie case of retaliation without another "link[]" in the "chain of intervening retaliatory acts." *Edwards v. Nat'l Vision, Inc.*, 946 F. Supp. 2d 1153, 1175-76 (N.D. Ala. 2013) (citing *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998)).  For the shunning to provide evidence of causation, the individuals who shunned her must be linked to her failing the TWQC tests and her resulting discharge.  In other words, Gautney has shown evidence of animus, but that animus is not shown to have had a connection to her discharge.  To consider such connections, the court now turns to Gautney's evidence of her TWQC tests being sabotaged.

(3) *Sabotage*

Gautney claims that TVA sabotaged her TWQC tests in retaliation for her EOC complaint with the intention of causing her discharge.  These claims of sabotage center on her third TWQC test and her fourth TWQC test.  Although Gautney states that she was visibly sick on the day of her first and second TWQC tests, she did

not request a postponement, and failing to affirmatively offer her a postponement does not constitute sabotage.

Gautney's third TWQC test does not provide her with evidence of an intervening retaliatory act or a link between the shunning and her discharge. Gautney claims that her weapon fired a dummy round at an irregular time during the ground portion of either the practice round or the qualifying round. As described in more detail above, *supra* pp. 4–5, the evidence does not show that the dummy round caused Gautney to fail. Gautney's low shooting accuracy in the qualifying round caused her to fail; she did not exceed the time limit, so whatever time the dummy round cost her is irrelevant. Even if a trainer added the dummy round with the intention that Gautney fail, she did not fail her third TWQC test for that reason. Thus, such alleged sabotage did not cause her discharge and does not link the trainers shunning her to her discharge.

Gautney's fourth TWQC test also does not provide evidence of sabotage that shows causation or that links her shunning to her discharge. The persons who shunned Gautney did not participate in the disputed portion of the test. Gautney does not claim that she experienced any irregularities on the ground portion, where the two trainers who had shunned her were stationed. Neither Parker nor anyone in the chain of command between Gautney and Parker were present at the shooting range. Her claims of sabotage derive from

the tower portion, where Nixon was stationed.  Nixon is one of the few TVA employees who Gautney says did **not** treat her differently after her EOC complaint.  Nixon testified that he personally pre-loaded the magazine with ammunition that Gautney later loaded into the thermal rifle during her qualifying round.  Gautney testified that she has no reason to doubt that Nixon pre-loaded the magazine and she does not accuse Nixon of sabotaging the thermal rifle. Thus, Nixon cannot serve as a causal link between her shunning and her failing the fourth TWQC test, and Gautney firing the dummy round cannot serve as evidence of an intervening retaliatory act with Nixon admittedly having no animus.

### (4) *Inadequate Training Opportunities*

Gautney contends that she had inadequate training opportunities before her TWQC tests and that this inadequacy is evidence of intervening retaliatory acts.  Gautney focuses on two exchanges with trainers.  First, she had one 30-minute training session with Thompson, who appeared rushed and "aggravated at having to help [her]." Doc. 28-1, ¶ 6.  Gautney did not ask Thompson to extend the session because of his demeanor and her knowledge that he typically left for home at that time in a car-pool.  However, she does not claim that he refused to train her or he refused to schedule additional training time with himself or another trainer.  Although his demeanor may have discouraged Gautney from requesting additional training time, his failure to

21

volunteer does not qualify as a retaliatory act.

Second, Gautney attempted to schedule independent training time on the practice range and had limited success.  She claims that Nixon "continually told" her that the range was in use by groups and he "did not point out any open times for the range that [she] could use." Doc. 28-1, ¶5.  Nixon's failure to volunteer to help Gautney does not qualify as retaliatory without evidence that trainers commonly did so for other guards.  Gautney has provided no such evidence.  Nixon's acts could be considered retaliatory if he deliberately impeded Gautney from scheduling trainings.  However, as discussed above, Gautney expressly disclaims suspicion of Nixon as a participant in the purported effort to get her discharged.  She also stated at her fourth TWQC test and in testimony that, notwithstanding her difficulty scheduling trainings, she was "ready" on the day of her fourth TWQC test.  If Nixon retaliated against her by impeding her scheduling trainings, which she does not allege, Gautney has denied that these acts affected her performance or caused her to fail her fourth TWQC test.

(5) *Disparate Treatment in Failing TWQC and Being Discharged*

Gautney claims disparate treatment both in failing the TWQC tests and in being discharged for failing them.  Causation can be inferred by disparate treatment if a similarly situated employee was disciplined in a different way for substantially the same conduct.  *See Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319,

1323 (11th Cir. 2006); *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.
1991). Gautney claims that no one else has failed a TWQC test and
no one else has been discharged except based on background checks.
In fact, seven other guards have failed a TWQC test since 2008. No
evidence indicates that these guards had also filed a EOC complaint
prior to failing the TWQC test. No evidence indicates that other
guards passed TWQC tests despite receiving substantially the same
scores as Gautney did when she failed. TVA has no discretion to
decide what qualifies as a passing score. 10 C.F.R. Pt. 73, App. B
§ VI(F)(3)(c). Six other guards have been discharged since 2009,
at least two of whom appear to have been discharged for reasons
other than a background check.[11] Gautney is correct that no other
guard has been discharged for failing to satisfy the TWQC
requirement. However, Gautney has provided no evidence that any
guard failed or should have failed all four TWQC tests but was not
discharged. TVA has no discretion to return guards to duty who
have failed the TWQC. 10 C.F.R. Pt. 73, App. B § VI(A)(6).

In short, Gautney has not provided evidence that TVA's "desire
to retaliate" against her EOC complaint was the "but-for cause" of
her discharge. *See Univ. of Texas Southwestern Medical Ctr. v.*

---

[11] TVA's records indicate that two guards were discharged for "Denial of
Unescorted Access," Doc. 27-17, which suggests but does not necessarily
involve an issue with a background check. One guard was discharged for
"failure to maintain S-11 medical," and one guard was discharged based on
"unavailability for work." *Id.* For two guards, the record entries do not list
a reason. *Id.*

*Nassar*, 133 S. Ct. 2517, 2528 (2013).   Although Gautney has provided evidence of intervening retaliatory acts, namely, being shunned, she has not shown any link between the shunning and her failing her TWQC tests.   Thus, without having established causation, Gautney has not shown a prima facie case of retaliation.

**2.   TVA's Proffered Reason and Pretext**

Even if Gautney has presented a prima facie case of retaliation, TVA would be entitled to summary judgment based on the lack of evidence of pretext.   Once the plaintiff makes out a prima facie case of Title VII retaliation, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-03 (1973).   Because defendant's burden "is one of production——not persuasion——the employer 'need not persuade the court that it was actually motivated by the proffered reason[].'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1205 (11th Cir. 2013) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)).   Defendant's offered reason "need only be specific enough so that the 'plaintiff [is] afforded a full and fair opportunity to demonstrate pretext.'" *Id.* (quoting *Chapman*, 229 F.3d at 1034).

TVA says that it discharged Gautney because TVA policy requires that it terminate any security guard who does not pass the TWQC in four attempts. Doc. 26-6, § 3.5.3.   NRC regulations also

require that security personnel pass a NRC-approved tactical weapons qualification, such as the TWQC, or that person cannot return to duty. 10 C.F.R. Pt. 73, App. B § VI(A)(6).  TVA's proffered reason for discharging Gautney is plausible on its face and certainly specific enough to require Gautney to show pretext.

TVA having produced a non-discriminatory reason for discharging Gautney, the burden shifts to Gautney to present evidence of pretext. *See McDonnell Douglas Corp v. Green*, 411 U.S. 792, 803 (1973).  She must provide "enough probative evidence so that a reasonable jury might conclude" that TVA's supposedly non-discriminatory reason is a pretext and that TVA really discharged Gautney in retaliation for her EOC complaint. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  Gautney may show pretext directly through evidence that a retaliatory motive is more likely, or indirectly through evidence that TVA's offered reason lacks credibility. *See Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1982).  The court finds that Gautney's effort to create pretext by rhetoric does not satisfy her burden, and TVA is entitled to summary judgment.

Gautney claims that the "evidence" shows pretext in two ways. First, she claims that TVA's ostensible reason for discharging her lacks credibility because TVA knew that the trainers shunning her and her limited training opportunities would "impair [her]

25

performance" on the TWQC tests.  As to her training opportunities, Gautney does not claim that she had limited training opportunities before her first and second TWQC tests, and she has expressly stated that she felt ready to take her fourth TWQC test notwithstanding the limited training opportunities.  As to the shunning, Gautney has provided no evidence that TVA knew that several trainers shunning her would impair her performance on the TWQC tests.  Her opinion that TVA knew about this possible effect, "without more," does not suffice as evidence of pretext. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).

Second, Gautney claims that the purported sabotage of her TWQC tests shows that TVA precipitated her failure of the TWQC tests and, therefore, knew that she did not actually fail when it used those test results as its basis to discharge her.  As discussed above, Gautney has not provided evidence of sabotage that links the trainers who shunned her to her failed TWQC tests.  Lacking a causal connection, the evidence does not show that TVA precipitated Gautney's failure of the TWQC tests or knew that the grounds for discharging her were ill-founded.  Gautney's belief that TVA and, more particularly, Parker engineered her discharge does not suffice as proof of pretext. *See Scalone v. Home Depot*, 280 F. App'x 905, 908 (11th Cir. 2008).

**CONCLUSION**

Although Gautney may have suffered social repercussions from filing her EOC complaint, she has not provided sufficient evidence for a prima facie case of retaliation. Even if she has, she also has not provided sufficient evidence that TVA's offered non-discriminatory reason for discharging her is a pretext. Accordingly, the court will grant by separate order TVA's motion for summary judgment.

DONE this 31st day of March, 2014.


_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE